Filed 3/7/23

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C094784 |
| Plaintiff, | (Super. Ct. No. 21HB3119) |
| v. | |
| CARLY SUE EDWARDS, | |
| Defendant and Respondent; | |
| STATE DEPARTMENT OF STATE HOSPITALS, | |
| Objector and Appellant. | |
| THE PEOPLE, | C095109 |
| Plaintiff, | (Super. Ct. No. 21HB4778) |
| v. | |
| STEPHEN MICHAEL BRAUNSTEIN, | |
| Defendant and Respondent; | |
| STATE DEPARTMENT OF STATE HOSPITALS, | |
| Objector and Appellant. | |

1

| | |
|---|---|
| THE PEOPLE, | C095141 |
| Plaintiff, | (Super. Ct. No. 21HB4779) |
| v. | |
| TROY ROBERT HARPER, | |
| Defendant and Respondent; | |
| STATE DEPARTMENT OF STATE HOSPITALS, | |
| Objector and Appellant. | |

APPEAL from judgments of the Superior Court of Shasta County, Cara L. Beatty, Judge.  Reversed with directions.

Rob Bonta, Attorney General, Cheryl L. Feiner, Assistant Attorney General, Gregory D. Brown and Lisa A. Tillman, Deputy Attorneys General for Objector and Appellant.

Arthur L. Bowie, under appointment by the Court of Appeal, for Defendants and Respondents.


The State Department of State Hospitals (DSH) oversees hospitals and other facilities that provide treatment to criminal defendants found incompetent to stand trial. In these three separate cases, which we have consolidated on appeal, the trial court found the defendants were incompetent to stand trial and ordered that they be committed to DHS for competency treatment.[1]  When DSH failed to admit the defendants in a timely manner, the trial court issued orders to show cause why sanctions should not be imposed, and it directed DSH to admit each defendant by a particular deadline.  When the

---

[1]  The defendants are Carly Sue Edwards (case No. C094784), Stephen Michael Braunstein (case No. C095109), and Troy Robert Harper (case No. C095141).

defendants were not admitted by that deadline, the trial court issued sanctions of $1,000 for each day past the deadline that the defendants were not admitted, for a total of $91,000.

Although only one of the sanctions orders states sanctions are imposed pursuant to Code of Civil Procedure section 177.5, both parties have proceeded on the assumption that sanctions were imposed pursuant to that section in all three cases, and we will do the same. Code of Civil Procedure section 177.5 provides, "A judicial officer shall have the power to impose . . . sanctions, not to exceed fifteen hundred dollars ($1,500), . . . for any violation of a lawful court order by a person, done without good cause or substantial justification. . . . [¶] . . . An order imposing sanctions shall be in writing and shall recite in detail the conduct or circumstances justifying the order." (Code Civ. Proc., § 177.5.)[2] DSH appeals all three sanctions orders, arguing: (1) the trial court erred in concluding DSH lacked good cause or substantial justification for failing to admit defendants by the court-ordered deadline; (2) the written orders imposing sanctions fail to specify the conduct or circumstances justifying the order in sufficient detail; and (3) the amount of sanctions imposed in each case exceeds the $1,500 limit provided in section 177.5. We reverse and remand.

## LEGAL BACKGROUND

A court may not try a criminal defendant who is mentally incompetent. (Pen. Code, § 1367, subd. (a).) Such a defendant is generally referred to as incompetent to stand trial or "IST." If a defendant is found IST by the court, Penal Code section 1370 provides that criminal proceedings "shall be suspended until the person becomes mentally competent." (Pen. Code, § 1370, subd. (a)(1)(B).) In order to "promote the defendant's speedy restoration to mental competence," the court shall commit the

---

[2] Undesignated statutory references are to the Code of Civil Procedure.

3

defendant to a DSH facility for treatment. (Pen. Code, § 1370, subd. (a)(1)(B)(i).)[3] Prior to the defendant's admission, the court must provide DSH with a "1370 packet," which includes copies of the commitment order, criminal history information, arrest reports, psychiatric examination reports, and medical records. (Pen. Code, § 1370, subd. (a)(3).) DSH uses the information in the packet to determine the appropriate placement for the particular defendant. (Pen. Code, § 1370, subd. (a)(2)(A).) There is currently not enough space at DSH facilities for immediate admission of all IST defendants, and they, thus, "are placed on a statewide waitlist based on the date of their commitment order. DSH endeavors to maintain a 'first in, first out' system for admission from the waitlist." (*Stiavetti v. Clendenin* (2021) 65 Cal.App.5th 691, 699; see also Cal. Code Regs., tit. 9, § 4710, subd. (a).)[4] Until an IST defendant is admitted to DSH, he or she remains confined in the county jail and generally receives limited to no treatment towards the restoration of competency. (See, e.g., *People v. Brewer* (2015) 235 Cal.App.4th 122, 133 [IST defendants "received no treatment toward restoration of competency" while in jail and awaiting transfer to DSH]; *In re Mille* (2010) 182 Cal.App.4th 635, 648 ["the limited pharmacological treatment rendered in the county jail cannot be equated with the broad spectrum of care afforded at . . . a fully accredited state mental hospital"].)

Although Penal Code section 1370 contains no deadline for DSH to actually admit an IST defendant, it does provide that, within 90 days of an IST defendant's commitment, DSH "shall make a written report to the court . . . concerning the defendant's progress

---

[3] The court may also commit the defendant to some other available public or private treatment facility, or place them on outpatient status. (Pen. Code, § 1370, subd. (a)(1)(B)(i).) All three defendants in this case were committed to DSH.

[4] DSH may admit an individual earlier based on certain criteria, including "[w]hether the individual exhibits psychiatric acuity which may indicate the need for admission to a facility, notwithstanding the date the court committed the individual to the Department." (Cal. Code Regs., tit. 9, § 4710, subd. (a)(2).)

toward recovery of mental competence." (Pen. Code, § 1370, subd. (b)(1).) Appellate courts have held an IST defendant must be admitted in sufficient time to allow DSH to make this required report: "[T]he statutory scheme requires that within 90 days of the order committing a defendant to a state mental hospital for treatment, the defendant must be delivered to the hospital, the hospital must examine the defendant and provide the defendant with treatment that will promote speedy restoration to competence, and the hospital's medical director must document the defendant's progress in a report to the court. ([Pen. Code, ]§ 1370.) For all of this to occur, a defendant needs sufficient time at the state mental hospital to be duly evaluated, potentially to derive some benefit from the prescribed treatment, and for such progress to be reported to the court." (*In re Mille, supra*, 182 Cal.App.4th at pp. 649-650.)

## FACTUAL AND PROCEDURAL BACKGROUND

The following is an abbreviated version of the factual and procedural background. Additional relevant facts will be discussed below.

In each of these three consolidated cases, the trial court found the defendant incompetent to stand trial and ordered each of them committed to DSH. In Shasta County Superior Court case No. 21HB4778 (the Braunstein case), DHS was directed to admit the defendant within 60 days of the order; the orders in the other two cases contained no admission deadline.

Each defendant filed a petition for writ of habeas corpus approximately 30 to 75 days after they were committed, arguing they were being illegally detained in jail rather than being admitted to a DSH facility in order to receive care, treatment and education needed to restore them to competency. The habeas corpus petitions are largely identical, and none requests sanctions or mentions section 177.5 (although all request other relief as the court deems appropriate).

In each case, the court issued an order to show cause (OSC) why sanctions should not be imposed. Each OSC quoted the portion of Penal Code section 1370 that requires

5

DSH to provide the court with a written report on the defendant's progress within 90 days of commitment, and noted that, for this to occur, "a defendant needs sufficient time at the state mental hospital to be evaluated, to ostensibly derive some benefit from the prescribed treatment, and for such progress to be reported to the court. This requires the petitioner to be timely transported to the state hospital, for the state hospital to receive him [or her], and for the state hospital to house and treat the petitioner." Each OSC concluded, "Given the failure of DSH to follow the statutory scheme, the DSH . . . is ORDERED to appear and show cause why sanctions should not be imposed." None of the OSCs mentioned section 177.5 or identified any other statute pursuant to which sanctions were being considered.

DSH filed similar (albeit not identical) responses in all three cases, arguing sanctions were not appropriate and it had good cause for not having admitted each defendant because: (1) there were not enough beds available in its facilities to immediately admit all IST defendants; (2) it admitted defendants from the waitlist in the order in which they were committed and could not prioritize certain defendants over others; (3) it was making good faith efforts to address the IST admission delay problem; and (4) delays were being caused by precautions it had taken in order to protect patients and staff from the COVID-19 pandemic. All three responses were supported by a declaration from Melanie Scott, DSH's acting deputy director, who described DSH's admission procedures, its efforts to decrease wait times for IST admissions, and its response to the pandemic. Two of the responses were also supported by a declaration from Katherine Warburton, DSH's medical director, who described telehealth services available to IST defendants while they awaited admission, including evaluations conducted via videoconference.

In Shasta County Superior Court case Nos. 21HB3119 (the Edwards case) and 21HB4779 (the Harper case), the trial court set a deadline for the defendants' admissions either at or immediately following the hearing on the OSC.

6

The trial court issued sanctions against DSH in all three cases. In each case, it imposed sanctions of $1,000 per day for each day past the date it had ordered the defendant to be admitted. In the Edwards case, sanctions totaled $10,000; in the Braunstein case, sanctions totaled $33,000; and in the Harper case, sanctions totaled $48,000. The written orders imposing sanctions in each case will be discussed in more detail below. Only the Harper order mentions section 177.5.

In the Edwards case, following the court's order imposing sanctions, DSH filed a request for a written statement of decision pursuant to section 632 and, given the trial court's failure to indicate the statute under which it was imposing sanctions, DSH also requested the trial court state whether it was imposing sanctions pursuant to section 177.5, section 1209, and/or a different statute. The trial court denied the request.

DSH filed a timely appeal in all three cases, challenging the orders imposing sanctions. It argues: (1) the trial court erred in finding DSH lacked good cause for its inability to comply with the court's admission deadlines; (2) the sanctions orders failed to adequately describe the conduct or circumstances justifying sanctions; and (3) the amount of sanctions imposed in each case exceeds section 177.5's $1,500 limit.

## DISCUSSION

### I

### *Standard of Review*

"We review orders imposing sanctions for abuse of discretion. [Citation.] The trial court must exercise its discretion in a 'reasonable manner with one of the statutorily authorized purposes in mind and must be guided by existing legal standards.' [Citation.] A mere difference of opinion between the appellate and trial courts is insufficient to warrant reversal. [Citation.]" (*People v. Hooper* (2019) 40 Cal.App.5th 685, 691-692 (*Hooper*).) "While this standard of review is highly deferential to the trial court's wide discretion in determining the facts, choosing from the array of available sanctions, and deciding the severity of any sanction chosen, an abuse of discretion will be found on

7

appeal if a sanctions order rests on incorrect legal premises [citation] or violates due process, matters we decide exercising our independent review. Alternatively, an abuse of discretion will be found if the findings underlying the order under review are factually unsupported [citation], which requires us to 'assess[] the record for substantial evidence to support the court's express or implied findings' [citation]." (*People v. Landers* (2019) 31 Cal.App.5th 288, 304.) "Questions of law, on the other hand, are subject to de novo review. [Citation.] When a trial court relies on a statute as authority to award sanctions, we review the interpretation of the statute de novo. [Citation.]" (*Hooper, supra*, at p. 692.)

## II

### *Code of Civil Procedure Section 177.5*

Section 177.5 provides: "A judicial officer shall have the power to impose reasonable money sanctions, not to exceed fifteen hundred dollars ($1,500), . . . payable to the court, for any violation of a lawful court order by a person, done without good cause or substantial justification. . . . [¶] Sanctions pursuant to this section shall not be imposed except on notice contained in a party's moving or responding papers; or on the court's own motion, after notice and opportunity to be heard. An order imposing sanctions shall be in writing and shall recite in detail the conduct or circumstances justifying the order." (§ 177.5.) "The evident purpose of Code of Civil Procedure section 177.5 is to punish and deter violations of lawful court orders [citation], and to compensate the judicial system for the cost of unnecessary hearings [citation]." (*People v. Landers, supra*, 31 Cal.App.5th at p. 303.)

#### A.    *Good Cause or Substantial Justification*

DSH acknowledges it did not admit the defendants by their court-ordered admission deadlines, and that it thus violated a court order (and it does not suggest that order was not lawful). It argues, however, that it had good cause or substantial

8

justification for its failure to timely admit these defendants, and that the trial court abused its discretion in concluding otherwise. We disagree.

"Code of Civil Procedure section 177.5 differs from Code of Civil Procedure section 128.5[5] and from contempt proceedings, both of which require the court to make a subjective determination of the party's intentions. [Citations.] Code of Civil Procedure section 177.5 requires only that a court find the person violated the order 'without good cause or substantial justification.' This does not require 'a willful violation, but merely one committed . . . without a valid excuse.' [Citations.]" (*People v. Kareem A.* (2020) 46 Cal.App.5th 58, 78.) DSH argues it had a valid excuse for its failure to comply with the court's admission deadlines, namely, there are simply not enough beds available to immediately admit all defendants found IST, and: (1) it could not have complied with the court's admission deadlines without harming other IST defendants who were higher up on the waitlist; (2) it has been working diligently to attempt to resolve the delayed admission problem; and (3) its response to the COVID-19 pandemic further delayed admissions.

The first two arguments are identical to arguments DSH raised, and we rejected, in *People v. Aguirre* (2021) 64 Cal.App.5th 652. Our decision in *Aguirre* contains a detailed discussion of the trial court's conclusion that DSH's proffered justifications for failing to admit IST defendants by the court-ordered deadline were insufficient to excuse its conduct. We repeat our discussion in full because DSH proffers those same justifications in this case: "The Department contends the trial court abused its discretion in imposing sanctions because there was good cause or substantial justification for its

---

5 Section 128.5 authorizes a court to order a party or the party's attorney "to pay the reasonable expenses, including attorney's fees, incurred by another party as a result of actions or tactics, made in bad faith, that are frivolous or solely intended to cause unnecessary delay." (§ 128.5, subd. (a).)

9

failure to comply with the court's admission deadlines. It raises two arguments: (1) it could not have complied with the admission deadlines without harm to IST defendants from other counties; and (2) it has been working diligently with other stakeholders to attempt to resolve the waitlist problem but has been unable to do so. . . . [¶] . . . [¶] The trial court rejected each of the Department's arguments in its omnibus order imposing sanctions. The court explained in the introduction to the order: 'Lengthy wait times are not new. The Court has previously found the Department in contempt on multiple occasions and sanctioned the Department for failing to timely admit defendants to a state hospital for competency restoration treatment. The responsibility to fix the problem falls squarely on the shoulders of the Department. The Court is convinced that none of the collaborative efforts over the past several years have given the Department sufficient incentive to carry out that responsibility, and the problem has not been fixed. The Department continues to violate the Court's orders in a large number of cases each year.' [¶] The trial court recognized that the Department is an agency of the State of California, not an isolated entity, and any lack of resources is due to a deliberate budgetary decision by the State. The court 'reject[ed] the notion that the State can repeatedly violate the due process rights of the mentally ill by denying the responsible agency adequate resources necessary to comply with Penal Code [s]ection 1370; and to then subsequently claim that the agency's inability to meet the need constitutes good cause.' [¶] The trial court also rejected the Department's argument that its efforts to solve the waitlist problem constituted good cause or substantial justification. The court found: 'It goes without saying that the ongoing efforts by the Department do not help the individuals whose due process rights have already been violated. The Court further notes that after five years of holding hearings on the issue the delays in admission are only slightly better today than they were when this Court started hearings. In no way has any improvement been sufficient to indicate that the need for the orders, or their enforcement, has been eliminated. The Department touts improvements but the fact remains that as of the date

10

of this order most defendants are waiting well beyond the 60 day order (from the providing of the packet); and do not have a meaningful report within the time period mandated by Penal Code [s]ection 1370. The Department continues to violate nearly every 60-day admit-by order set by the Court, and Penal Code [s]ection 1370, by a considerable margin.' " (*Id*. at pp. 668-669, fn. omitted.)

For the same reasons we rejected these arguments in *Aguirre*, we reject them here.

The COVID-19 argument was not raised in *Aguirre*. DSH argues the delay in admitting the three defendants in this case "was directly related to [its] response to the COVID-19 pandemic." The evidence it cites fails to support its argument.

The evidence proffered by DSH shows it temporarily suspended IST defendant admissions in response to a surge in COVID-19 on two separate occasions: (1) from March 23, 2020, to May 22, 2020, right after the Governor declared a state of emergency and issued shelter-in-place orders; and (2) from January 12, 2021, to no later than February 8, 2021. The evidence, however, fails to address how either of these suspensions affected the defendants' admissions, or admissions in general. For example, Harper was committed to DSH on June 7, 2021, more than a year after the initial suspension of admissions ended, and four months after the second suspension of admissions ended. By late July, he was number 827 on the waitlist, and he was finally admitted on September 29. DSH states the waitlist in late July was 1,426, but it does not state what the waitlist was in February 2020, the month before it first suspended admissions due to COVID-19, or in January and February 2021, immediately before and after the second suspension. Without this information, we have no way of knowing how either suspension affected the waitlist in general, or Harper's position on the waitlist (if at all).

We note that DSH states in its brief that its "implementation of its COVID-19 policies resulted in an increased waitlist for admission." However, DSH does not actually cite any evidence that supports it, and it is axiomatic that statements made in

11

briefs are not evidence. (*In re Zeth S.* (2003) 31 Cal.4th 396, 414, fn. 11 ["It is axiomatic that the unsworn statements of counsel are not evidence"]; *Acqua Vista Homeowners Assn. v. MWI, Inc.* (2017) 7 Cal.App.5th 1129, 1158, fn. 43 [statements made by counsel concerning actions taken by client "clearly do not constitute *evidence*"].) Moreover, even if we assume DSH's waitlist increased as a result of COVID-19, DSH fails to provide evidence as to whether such increase affected these three defendants' admission dates.

All of DSH's proffered evidence suffers from similar problems. For example, it states it reduced its patient census in order to establish isolation and quarantine space within its facilities, but it does not state by how much or how the reduction affected the waitlist. As another example, it states a facility's rate of admission is dependent on (1) its ability to screen, test, observe, and quarantine patients, and (2) any COVID-19 transmission in the facility. Again, however, it does not state how this affected either the size of the waitlist or these three defendants' admission dates. Finally, it states it took numerous actions in response to COVID-19, including: monitoring a rapidly changing situation; activating an emergency operation center and incident command centers; developing incident plans; updating infection control and pandemic response plans; implementing quarantine and social distancing protocols to reduce the risk of COVID-19 transmission; vaccinating patients and staff once vaccines became available; requiring the sending facility to provide an individual's updated health information relative to COVID-19 within 24 hours of transport; and admitting patients in cohorts. Again, however, this evidence fails to show how any of these actions affected the size of its waitlist or these three defendants' admission dates.

DSH's evidence fails to demonstrate that the delay in admitting these three defendants was related to COVID-19 or its response thereto.

DSH has not shown either good cause or substantial justification for not complying with the court's deadlines.

*B.     Written Sanctions Orders*

Section 177.5 provides an order imposing sanctions must satisfy two requirements:  (1) it must be in writing; and (2) it must "recite in detail the conduct or circumstances justifying the order."  (§ 177.5.)  DSH argues the orders in this case fail to comply with the second requirement.

The purpose of the specificity requirement of section 177.5 " 'is to fulfill the "rudiments" of due process required for governmental imposition of a penalty . . .—both for due process' own, constitutional sake and to ensure that the power conferred by the statute will not be abused.  [Citation.]  Moreover, in some cases the court's recitation will be an invaluable aid to a reviewing court determining whether the trial court abused its discretion in awarding sanctions.  [Citation.]' "  (*Caldwell v. Samuels Jewelers* (1990) 222 Cal.App.3d 970, 977.)  In order to comply with the specificity requirement, the " 'court's written order "should be more informative than a mere recitation of the words of the statute." ' "  (*Foundation for Taxpayer & Consumer Rights v. Garamendi* (2005) 132 Cal.App.4th 1375, 1388.)  It must do more than merely state " 'good cause appearing.' "  (*Caldwell, supra*, at p. 977.)  It "must state the specific circumstances giving rise to the [sanction], and state with particularity the basis for finding those circumstances amount to" violation of a lawful order without good cause or substantial justification.  (*Id.* at pp.977- 978.)  The requirement for a detailed recitation "may be satisfied by incorporating by reference 'papers setting forth the conduct, circumstances, and legal arguments underlying the court's conclusions.' "  (*Foundation for Taxpayer & Consumer Rights, supra*, at p. 1388.)  Because section 177.5 requires the order to be in writing, "A trial judge's on-the-record oral recitation of reasons for imposing sanctions is insufficient."  (*Childs v. PaineWebber Incorporated* (1994) 29 Cal.App.4th 982, 996; see also *People v. Hundal* (2008) 168 Cal.App.4th 965, 970 [imposing sanctions "orally from the bench" does not comply with § 177.5].)

With these rules in mind, we discuss each sanctions order separately.

13

### i. Harper

The order in the Harper case, which was issued on or about October 22, 2021, is by far the most detailed of the three.[6] It states the court ordered DSH to admit Harper within 60 days of the commitment order, or by August 10, 2021, and that Harper was not admitted until September 29, 2021, which was 49 days after the court-ordered deadline. It notes, "When criminal proceedings are suspended, a defendant's speedy trial rights are obviously implicated. But a defendant's competency is also of constitutional dimension." It also notes, "During the time the defendant was awaiting acceptance to DSH, he decompensated and refused to come to court." It states DSH "is an agency of the State of California. Despite efforts by the DSH to solve the multi-layered problems of delay in admissions for committees who have been ordered to be received by the DSH, the Court FINDS—on balance—the rights of the committees are violated each day a committee is not received in a timely fashion." It imposes sanctions in "the sum of $1000 per day from August 11, 2021 to the date of September 28, 2021. These sanctions are payable to the Shasta County Superior Court." Finally, and importantly, it states, "These sanctions are ordered pursuant to Code of Civil Procedure section 177.5 and *People v. Aguirre* (2021) 64 Cal.App.5th 652."

As noted above, the requirement for a detailed recitation "may be satisfied by incorporating by reference 'papers setting forth the conduct, circumstances, and legal arguments underlying the court's conclusions.' " (*Foundation for Taxpayer & Consumer Rights v. Garamendi, supra*, 132 Cal.App.4th at p. 1388.) In *Hooper, supra*, 40 Cal.App.5th 685, for example, the order imposing sanctions incorporated by reference

---

[6] The trial court also issued a shorter order on September 13, 2021, imposing sanctions against DSH in the sum of $1,000 per day from September 9, 2021, until Harper was admitted. Because the October 22 order is more detailed, that is the order we have analyzed for compliance with section 177.5.

a 40-page decision in another case (*People v. Czirban* (Super. Ct. Contra Costa County, 2017, No. 05-151662-4)), and the court noted the *Czirban* decision "provide[d] a detailed analysis of DSH's violations and addresse[d] why each of the justifications DSH proposed at the time were insufficient to excuse its conduct. Because the court issued *Czirban* in August—in the middle of the hearings for this case—there is no reason to require the court to repeat itself to DSH.[7] The sanctions orders were sufficiently detailed." (*Hooper, supra*, at p. 694.)

So, too, in this case. Although the trial court does not expressly state it is incorporating by reference our reasoning in *Aguirre*, we find that stating sanctions are imposed pursuant to *Aguirre* is substantially equivalent of doing so.

Because the Harper sanctions order effectively incorporates this discussion in *Aguirre*, we find it is sufficiently detailed to satisfy section 177.5.

    ii.    <u>Edwards</u>

The order imposing sanctions in the Edwards case states, in its entirety: "On February 10, 2021, the petitioner, Carly Sue Edwards, was committed to the Department of State Hospitals (DSH) for competency treatment. On June 14, 2021, this Court ordered DSH to receive Ms. Edwards no later than Friday, June 18, 2021. DSH failed to comply with this Court's order to receive the petitioner by June 18, 2021. The Court finds that DSH violated the Court's order without good cause or substantial justification. [¶] IT IS HEREBY ORDERED THAT the Department of State Hospitals is sanctioned in the amount of one thousand dollars ($1,000) per day, for every day beyond June 18, 2021 which the Department failed to receive the Petitioner. Having failed to receive the

---

**7** The *Czirban* decision was never appealed, and thus did not result in a reported decision, but it was described in *Hooper*. (See *Hooper, supra*, 40 Cal.App.5th at pp. 689-690.)

15

Petitioner until June 29, 2021 (ten full days beyond the Court's order), the total amount of sanctions imposed is $10,000."

We find this order insufficient because it contains no detail explaining the trial court's finding that DSH lacked good cause or substantial justification for its failure to admit Edwards by the court-ordered deadline. Instead, it does no more than recite the words of the statute.

In arguing the order is sufficient, the defendants rely largely on statements the court made at the hearing on the OSC, which they quote at length. As noted above, however, "A trial judge's on-the-record oral recitation of reasons for imposing sanctions is insufficient." (*Childs v. PaineWebber Incorporated, supra*, 29 Cal.App.4th at p. 996.) Instead, the reasons must be recited in detail in the written order. Here, the written order is insufficiently detailed, thus we find remand necessary.

"Having failed to make findings, the trial court is not deprived of this opportunity forever. [¶] We remand so that the trial court may either make findings in a manner consistent with the views expressed in this opinion, or in the alternative, vacate its award of [sanctions]." (*Fegles v. Kraft* (1985) 168 Cal.App.3d 812, 817; see also *People v. Ward* (2009) 173 Cal.App.4th 1518, 1531 [reversing sanctions order that did not contain requisite details and remanding "so the trial court can enter a proper sanctions order"].)

### iii.      Braunstein

The order in the Braunstein case was issued on September 3, 2021, and corrected on September 30, 2021. The September 3 order states, in full: "The Department of State Hospitals ('DSH') is an agency of the State of California. Despite efforts by the DSH to solve the multi-layered problems of delay in admission for committees who have been ordered to be received by the DSH, the Court FINDS—on balance—the rights of the committees are violated each day a committee is not received in a timely fashion. [¶] The Department of State Hospitals is ORDERED to pay County of Shasta the sum of

16

$1,000 per day from August 2, 2021 forward until DSH receives Stephen Braunstein for competency training."

We note that the August 2 date comes from the court's June 3 order committing Braunstein to DSH and directing that he be admitted within 60 days; 60 days from June 3 is August 2. As far as our review of the record reveals, the first time daily sanctions from August 2 forward were mentioned was at a hearing held on August 25, when the public defender stated: "The 60th day was August 2nd. Mr. Braunstein has been waiting a significant time to be transported . . . . I would ask that sanctions be ordered back to the date of August 2nd at a thousand dollars a day." The court agreed that if Braunstein was not admitted by August 31, it would impose sanctions as requested by the public defender.

Braunstein was not admitted by August 31. At a hearing held that day, the court stated it was imposing sanctions of $1,000 a day from August 2 until he was admitted.

Another hearing was held on September 14, and Braunstein still had not been admitted (although by this time, DSH had provided the court with a written report on Braunstein).[8] The court stated, "I'm going to issue from today's date forward the sanctions of $1,000 a day . . . . [¶] And should Mr. Braunstein be received by the [23rd] of September, I won't retroactively request those sanctions to be imposed. But if he's not received by that date then I will retroactively impose sanctions to August 31, 2021."

Braunstein was admitted on September 23.

---

[8] The report states it "is written pursuant to Penal Code section . . . 1370(b)(1)." It is based on DHS's review of the 1370 package, a 15-minute interview with Braunstein on August 30 that was done via Webex, and a 15-minute phone consultation with jail mental health staff on August 31. The report is dated September 2, which is 91 days after Braunstein was committed. At the hearing on August 14, the court acknowledged receiving the report, and noted, "I do feel that the Department is doing what they need to do to try to move this along as best they can under the circumstances, but we still have Mr. Braunstein here."

On September 30, the court issued what it captioned a "**Corrected** ORDER" that stated, "On September 3, 2021, the court ORDERED the Department of State Hospitals (DSH) to pay the sum of $1000 per day in sanctions from August 2, 2021 until such time as Stephen Michael Braunstein has been received by the DSH. [¶] The sanctions ARE PAYABLE TO THE **SHASTA COUNTY SUPERIOR COURT**. [¶] The sanctions due from August 2, 2021 to September 3, 2021 – the day of the order – are in the sum of $1000 per day, a total of $33,000. [¶] This sum is collectible by the Shasta County Superior Court." This corrected order contains no recitation of the conduct or circumstances justifying sanctions.

We find the description of the conduct or circumstances in this case, insufficient to satisfy section 177.5's requirement to "recite in detail the conduct or circumstances justifying" sanctions, and as with Edwards, we will remand to the trial court to either make sufficient findings or, in the alternative, to vacate its award of sanctions. (*Fegles v. Kraft, supra*, 168 Cal.App.3d at p. 817.)

C.     *The $1,500 Cap on Sanctions*

Section 177.5 provides the court may impose sanctions "not to exceed" $1,500 for violation of a lawful court order. Here, the trial court imposed sanctions of $1,000 for each day the defendant was not admitted to DSH beyond the court's deadline. It imposed a total of $10,000 in sanctions in the Edwards case, $33,000 in the Braunstein case, and $48,000 in the Harper case. DSH argues this was error, and that section 177.5 caps sanctions at $1,500 in each of the three cases no matter how long it took to admit the defendant. The defendants argue section 177.5 allows sanctions of up to $1,500 a day for each day DSH violates a court-ordered admission deadline.

"In analyzing the scope of Code of Civil Procedure section 177.5, '[w]ell-established rules of statutory construction require us to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law.' [Citations.] ' "In determining such intent, a court must look first to the words

18

of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose." ' " (*People v. Kareem A., supra*, 46 Cal.App.5th at p. 71.) " ' "If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend." ' " (*City of San Jose v. Superior Court* (2017) 2 Cal.5th 608, 616.)

Again, section 177.5 provides the court may "impose reasonable monetary sanctions, *not to exceed fifteen hundred dollars ($1,500)*, . . . for any violation of a lawful court order." (Italics added.) DSH argues the italicized language caps sanctions at $1,500, and does not allow the court to get around this cap by imposing daily sanctions in an amount under the cap if the total amount imposed exceeds $1,500.

Both sides cite *Hooper, supra*, 40 Cal.App.5th 685, to support their respective arguments. In that case, the trial court imposed sanctions of $100 per day for each day past the court-ordered deadline that DSH failed to admit an IST defendant. The trial court imposed a total of $16,500 in sanctions in 11 separate cases, which would mean (on average) that it did not impose sanctions exceeding $1,500 for any one defendant. (*Id.* at p. 691.) DSH argued the court lacked authority to impose daily sanctions, but the appellate court disagreed, explaining, "It is immaterial that no statute specifically authorizes the court to order daily sanctions because section 177.5 'do[es] not require the court to relate the amount of the sanction to the actual cost to the county traceable to the violation of the court order.' [Citation.] Rather, the sanction amount must only be reasonable and within the $1,500 limit. (§ 177.5.) The sanctions orders here do not exceed the statutory maximum, and DSH fails to show that the amounts are unreasonable." (*Id.* at p. 695.) DSH focuses on the court's statement that "the sanction amount must . . . be . . . within the $1,500 limit," and the defendants focus on the fact that the court allowed daily sanctions. We note, however, that the *Hooper* court was not faced with the precise issue raised in this case, because for each defendant, the total

amount of daily sanctions were within the $1,500 limit.  The *Hooper* court thus had no reason to consider whether daily sanctions were appropriate if the total amount exceeded $1,500, and "a 'case is not authority for an issue not raised by its facts.' " (*Yao v. Superior Court* (2002) 104 Cal.App.4th 327, 333.)

Although not discussed by either party, we find it helpful to compare section 177.5 to sections 1209 and 1218 and the cases interpreting those two sections.  Section 1209, subdivision (a)(5) defines contempt as including "[d]isobedience of any lawful . . . order . . . of the court," and section 1218, subdivision (a) provides if a person is found guilty of contempt, "a fine may be imposed on the person not exceeding one thousand dollars ($1,000)."  This language is substantially similar to section 177.5's provision that the court may "impose . . . sanctions . . . not to exceed fifteen hundred dollars ($1,500) . . . for any violation of a lawful court order."  It has long been held that "section 1218 does not limit the court to a total fine of [$1,000].  *Where separate contemptuous acts are committed, the contemner can be fined for each offense in the amount authorized by the code.*" (*Donovan v. Superior Court of Los Angeles County* (1952) 39 Cal.2d 848, 855, italics added; see also *In re Stafford* (1958) 160 Cal.App.2d 110, 113 ["Every separate act of disobedience of the injunction was a separate contempt" and could be punished as such].)  "Every separate act of disobedience of [a court order] is a separate contempt. [Citations.]  [¶]  We believe the crucial question is whether separate adjudications of contempt were based upon separate insults to the authority of the court, not whether the insults happened to occur on the same or different days." (*Reliable Enterprises, Inc. v. Superior Court* (1984) 158 Cal.App.3d 604, 621, disapproved on another ground in *Mitchell v. Superior Court* (1989) 49 Cal. 3d 1230, 1248, fn. 13; see also, e.g., *Conn v. Superior Court* (1987) 196 Cal.App.3d 774, 786 [upholding finding of contempt where the plaintiff turned over documents 38 days after court-ordered deadline, but holding court could not impose $38,000 in fines, or $1,000 per day for each day past the court-

ordered deadline, because "the circumstances of the case are such that [the plaintiff's] failure to turn over the . . . documents can only be considered one act of contempt"].)

"Where, as here, legislation has been judicially construed and a subsequent statute on the same or an analogous subject uses identical or substantially similar language, we may presume that the Legislature intended the same construction, unless a contrary intent clearly appears." (*Estate of Griswold* (2001) 25 Cal.4th 904, 915-916.) Since no evidence of a contrary intent clearly appears, we presume the Legislature intended to limit sanctions under section 177.5 to $1,500, unless separate violations of a court order are committed, in which case the violator could be fined up to $1,500 for each separate violation. In this case, however, the trial court made no findings on whether DSH committed separate violations of a court order on each day beyond the court's deadline that it failed to admit a defendant. We will thus remand this case to the trial court to make such findings in the first instance.

After this case was fully briefed, the First District Court of Appeal issued its decision in *In re Chunn* (2022) 86 Cal.App.5th 639 (*Chunn*), holding, among other things, that section 177.5 limits sanctions to $1,500 for each individual IST defendant. *Chunn* involved a challenge by DSH to a standing order of the Solano County Superior Court that specified certain deadlines by which DSH had to engage with, begin treatment of, and admit IST defendants. (*Id.* at p. 644.)[9] As relevant here, the standing order also

---

[9] In particular, the standing order provided: (1) upon DSH's receipt of the commitment packet, if the defendant could not be placed in a DSH facility within 72 hours, DSH was required to commence meaningful engagement with, and treatment of, the defendant prior to the expiration of those 72 hours; (2) if DSH failed or declined to commence meaningful engagement and treatment within 72 hours, then placement in a DSH facility had to occur within seven days of the commitment order; and (3) if DSH did not place the defendant within seven days, it was required to notify the court when the defendant was likely to be admitted, and if admittance was not anticipated to occur within 28 days, DSH was required to develop a written treatment plan, and provide a weekly written report to the court. (*Chunn, supra*, 86 Cal.App.5th at pp. 651-652.)

provided, "The Court finds that each day of delay in placement or commencement of treatment poses a substantial risk of significant harm and injury for each IST defendant. Accordingly, for purposes of both recognizing the gravity of this suffering and encouraging prompt DSH compliance with this order, the Court shall deem each 24-hour period of non-compliance a new, separate and distinct violation of its orders for purposes of imposing potential sanctions under [Code of Civil Procedure] section 177.5. The trial court managing each case, may, in its discretion, schedule daily contempt hearings during the period of delays in commitment at which time the court may seek to impose daily sanctions, presumably in an amount equal to the costs of actually providing these defendants treatment each day, but in no circumstances more than $1500 per day or event." (*Chunn, supra*, at p. 653.) DSH challenged this provision, arguing section 177.5 limits sanctions "to $1,500 for each individual IST defendant, not $1,500 each *day* for each defendant."[10] (*Chunn, supra*, at p. 669.) The court agreed, for three reasons.

First, the court noted, "On its face, the plain language of [section 177.5] limits a sanctions award to $1,500 and does not include any reference to successive, per-day sanctions or state whether each day of noncompliance with a court order would allow for a separate violation within the meaning of the statute." (*Chunn, supra*, 86 Cal.App.5th at p. 670.) It also cited (but did not discuss) two statutes that specifically allow daily fines or sanctions: (1) Civil Code section 789.3, subdivision (c)(2), which provides, "Any landlord who violates this section shall be liable . . . for . . . [¶] . . . [¶] . . . [a]n amount not to exceed one hundred dollars ($100) *for each day or part thereof the landlord remains in violation of this section*" (italics added); and (2) Public Utilities Code section

_____

**10**  We note that section 177.5 is a generally applicable statute that does not mention IST defendants, and that it does not limit sanctions to $1,500 *for each individual IST defendant*. It authorizes sanctions "not to exceed" $1,500 for any violation of a court order done without good cause or substantial justification. (§ 177.5.)

2108, which provides, "Every violation of the provisions . . . of any order . . . of the commission, by any corporation or person is a separate and distinct offense, and *in the case of a continuing violation each day's continuance thereof shall be a separate and distinct offense*." (Italics added.) Presumably the *Chunn* court's point in citing these two statutes is to show the Legislature knows how to authorize daily sanctions when it wants to, and the fact that it did not expressly do so in section 177.5 supports the conclusion that it did not intend to allow them. (See, e.g., *Yeager v. Blue Cross of California* (2009) 175 Cal.App.4th 1098, 1103 ["We may not make a silent statute speak by inserting language the Legislature did not put in the legislation"].) Although this conclusion is colorable, because the language of section 177.5 is so similar to the statutes governing contempt, we are more persuaded by the rule, quoted above, that "[w]here . . . legislation has been judicially construed and a subsequent statute on the same or an analogous subject uses identical or substantially similar language, we may presume that the Legislature intended the same construction." (*Estate of Griswold, supra*, 25 Cal.4th at pp. 915-916.) Because a court may impose separate fines up to the statutory maximum for separate acts of contempt, we conclude section 177.5 authorizes a court to impose separate sanctions up to the statutory maximum of $1,500 for separate violations of a lawful court order.

Second, the *Chunn* court noted that *Hooper* and two other cases (*People v. Kareem A., supra*, 46 Cal.App.5th 58 and *People v. Aguirre, supra*, 64 Cal.App.5th 652) had upheld sanctions of up to $1,500 per defendant. (*Chunn, supra*, 86 Cal.App.5th at p. 670.) None of these cases, however, considered whether daily sanctions were permissible under section 177.5, and, as noted above, " 'a case is not authority for an issue not raised by its facts.' " (*Yao v. Superior Court, supra*, 104 Cal.App.4th at p. 333.)

Third, and finally, the *Chunn* court reviewed the legislative history of section 177.5, and concluded it "suggests that the Legislature intended to strictly limit the amount of sanctions permitted under the statute to $1,500." (*Chunn, supra*,

23

86 Cal.App.5th at p. 670.)  We quote its discussion of the legislative history in full:  "In the original draft of Assembly Bill No. 3573 (1981-1982 Reg. Sess.) (Assembly Bill 3573), the proposed statutory language did not include any limitation on the amount of sanctions the court could order.  (Assem. Bill 3573, § 1, as introduced Mar. 15, 1982.)  Thereafter, the Assembly amended the bill to include the $1,500 limit.  (Assem. Amend. to Assem. Bill No. 3573 (1981-1982 Reg. Sess.) May 3, 1982, § 1.)  [¶]  Further, a Senate Committee on the Judiciary report analyzing Assembly Bill 3573 discussed existing options for enforcement of courtroom rules.  One of the options it highlighted was '[c]oercive contempt,' which aims to correct bad acts or omissions that violate court orders.  (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 3573 (1981-1982 Reg. Sess.) as amended May 3, 1982, pp. 3-4.)  This was typically done, the report explained, 'through imposition of a fine of so-much-per-day until the contemnor agrees to obey.' (*Id*. at p. 4.)  However, despite this reference to per-day contempt sanctions, the report does not indicate that Code of Civil Procedure section 177.5 was to operate in a similar fashion.  (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 3573, *supra*, p. 4.)  To the contrary, the report repeatedly referenced the proposed statute's plain language, noting that sanctions would be permissible 'up to $1,500.'  (*Id*. at pp. 5, 7.)"  (*Id.* at pp. 670-671.)  We agree with *Chunn* that the legislative history of section 177.5 demonstrates the Legislature intended to limit sanctions to $1,500; indeed, section 177.5 clearly states that sanctions shall not exceed $1,500.  However, neither the legislative history nor the language of section 177.5 expressly addresses whether multiple sanctions of up to $1,500 may be imposed for separate violations of a court order.[11]

---

[11]  Indeed, because section 177.5 uses language that is substantially similar to the contempt statutes, and because the legislative history of section 177.5 demonstrates the Legislature was aware that judges had the power to utilize coercive contempt to enforce compliance with their orders, one could conclude that the Legislature intended to allow trial courts to impose something akin to coercive contempt pursuant to section 177.5 in

24

For the reasons stated herein, we interpret section 177.5 as allowing sanctions of up to $1,500 for each separate violation of a court order, and we remand this case to the trial court to determine in the first instance whether DSH committed separate acts of violating a court order on each day that it failed to admit the defendants past the court-ordered deadline, or whether its failure to admit the defendants can only be considered one act of violating a court order. If the trial court determines DSH committed separate acts of violating a court order, its written order imposing sanctions "shall be in writing and shall recite in detail the conduct or circumstances justifying" that determination. (§ 177.5.)

## DISPOSITION

The sanctions orders are reversed, and these cases are remanded to the trial court with directions to make sufficient findings to support the imposition of sanctions in the Edwards and Braunstein cases, and in all three cases, to make findings to support the imposition of daily sanctions, if appropriate, or to vacate or reduce its award of sanctions. Any order imposing sanctions should clearly identify the statute pursuant to which sanctions are being imposed.

                                          /s/
                                    EARL, J.

We concur:


      /s/
HULL, Acting P. J.


      /s/
BOULWARE EURIE, J.

_____

order to compel compliance with lawful court orders. We need not decide this issue, however, because the trial court in this case did not impose something akin to coercive contempt, and instead effectively imposed daily sanctions retroactively.

25